IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| J.E. MCAMIS, INC., a California corporation; and MCAMIS INDUSTRIES OF OREGON, an Oregon corporation, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil No. 04-1317-JO |
| v. | ) ) | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| MILLER CONTRACTING, INC., a Washington corporation; and THE HARTFORD FIRE INSURANCE COMPANY, a Connecticut corporation, | ) ) ) ) ) | |
| Defendants. | ) ) | |
| MILLER CONTRACTING, INC., a Washington corporation; and THE HARTFORD FIRE INSURANCE COMPANY, a Connecticut corporation, | ) ) ) ) ) | |
| Third-Party Plaintiffs, | ) ) | |
| v. | ) ) | |
| WILDER CONSTRUCTION COMPANY, a Washington corporation; JAMES T. CAMPBELL dba CAMPBELL TOWING AND MARINE CONSTRUCTION, an Oregon sole proprietership; and the NORTON BAY O.N. 619820, her hull, engines, tackle, machinery, equipment, electronics, bunkers and furnishings, *in rem*, | ) ) ) ) ) ) ) ) | |
| Third-Party Defendants. | ) | |

1   -   FINDINGS OF FACT AND CONCLUSIONS OF LAW

William J. Ohle
Daniel F. Knox
Hamilton H. Emery, IV
SCHWABE WILLIAMSON & WYATT, PC
1600-1900 Pacwest Center
1211 SW Fifth Avenue
Portland, OR 97204

Attorneys for Plaintiffs

John R. Welch
Sandip Soli
S. Jay Terry
CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104

David B. Markowitz
MARKOWITZ, HERBOLD, GLADE & MEHLHAF, PC
1211 SW Fifth Avenue, Suite 3000
Portland, OR 97204

Attorneys for Defendants

JONES, Judge:

## **INTRODUCTION**

Plaintiffs J.E. McAmis, Inc. and McAmis Industries of Oregon (collectively "McAmis")

bring this admiralty action for breach of contract and payment on a payment bond against Miller

Contracting, Inc. ("Miller") and the Hartford Fire Insurance Company ("Hartford"). This dispute

revolves around damage and repairs to two dump barges, a crane barge and a crane owned by

McAmis. The vessels were subcontracted to Miller for use in maritime dredging operations in

Washington. This court has admiralty jurisdiction under 18 U.S.C. § 1333 and parties have

agreed that venue is proper under the venue choice provision of the contract. *See* Compl. Ex A ¶

19(a).

2   -   FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is an admiralty case, and was thus tried to the court commencing on March 18, 2008, with closing arguments on March 24, 2008.  Prior to trial, the third-party complaint was resolved and thus only the claims between McAmis, Miller and Hartford were the subject of trial.[1]  After a through review of the documentary and testimonial evidence the court concludes, for the reasons set forth below, that defendants are liable for damages in the amount of $1,173,189.77, less the tendered amount of $122,200.63, plus accrued interest as detailed below.

## BACKGROUND[2]

### A.    The Contracts

In 2003, Miller was a contractor for a portion of the Hylebos Waterway Dredging and Disposal Project, located in the Commencement Bay Nearshore/Tideflats Superfund site in Tacoma, Washington.  Miller initially sought to bareboat charter the vessels from McAmis for use in the project.  A bareboat charter is "[a] charter under which the shipowner surrenders possession and control of the vessel to the charterer, who then success to many of the shipowner's rights and obligations."  Black's Law Dictionary 205 (8th ed. 2004).  In the initial negotiations in the spring of 2003, the parties contemplated a rental period of July 1, 2003 to December 31, 2003.  McAmis sought $85,000 per month for the use of the crane and crane barge, and $35,000 per month for the use of each dump barge under a bareboat charter.  *See* Trial

---

[1]  The gravamen of the third-party complaint was that any damage caused to the McAmis vessels was the responsibility of the third-party defendants.  Summary judgment was granted in favor of third-party defendants John T. Campbell and the Norton Bay on December 11, 2006.  Third-party defendant Wilder Construction Company settled on the eve of trial for $150,000.

[2]  The parties largely agree on much of the background, which is synthesized here.  To the extent that any of the facts cited in this section differ from those proffered by one or both sides, those facts should construed as the court's findings.

Exs. 151-54.

However, the parties soon discovered that the Jones Act forbade such an arrangement because Miller is a wholly-owned subsidiary of JJM Group, Canadian company. Trial Ex. 34, 143. Thus, on July 1, 2003, the parties opted to enter into a subcontract for the use of the vessels. Miller paid McAmis's legal costs related to the drafting of this specialized subcontract. The operative agreement between the parties here is a subcontract, effective July 1, 2003 (the "Amended Subcontract"). Trial Ex. 2. Two further amendments expanded the scope of work for which the vessels were to be used, but did not otherwise alter the agreement. They added dredging work to be done at: (1) the Head of Thea Foss Remediation Project in Tacoma; and (2) the Duwamish Waterway in Seattle, Washington. Trial Exs. 3, 4. The duration of the Amended Subcontract was also extended through February 15, 2004. Trial Ex. 5. Miller agreed to pay McAmis the same vessel rental fees as would have been paid as part of a bareboat charter. Miller has fully paid for the use of the vessels during the dredging projects, and the amount due for that period of time is not in dispute. The contract limits consequential damages, allows reasonable attorney's fees, and calls for daily interest at an annual rate of 12% for any late payments of monies due. Compl. Ex. A ¶¶ 2, 13, 19(d)(ii)

What is in dispute is the amount of damage done to the vessels, especially the hoppers of the dump barges. A number of contract provisions are also at issue between the parties. The primary dispute hinges on the requirement that Miller compensate McAmis for repairs "due to any bucket damage and such other damage exceeding ordinary wear and tear" on the vessels. The source of, and liability for such damage to the vessels is made murkier by the fact that they were used in another dredging project before the major damage attributed to Miller were

4   -   FINDINGS OF FACT AND CONCLUSIONS OF LAW

performed.

**B.    The Vessels**

McAmis provided three barges as part of the Amended Subcontract.  The Crystal Gayle is a crane barge, which carries an American 12-210 track crane.  This crane was used for all of the dredging operations, and was usually operated by McAmis employee Del Thompson.  He was the dredge captiain, who along with several McAmis employees operated dredging equipment on Miller's behalf as part of the Amended Subcontract.  The Crystal Gayle crew employed dredge buckets weighing from approximately 20,000 to over 40,000 pounds.  However, the damage in dispute, as described later, was caused by a Miller subcontractor.  At the heart of the dispute here are the two dump barges, the Sand Island and the Swan Island.  These two split hull barges were designed by Glosten Associates, who worked with John McAmis to create hopper plating angles appropriate for use in carrying and dumping a variety of sticky mud encountered in Alaskan dredging projects.  The Sand Island was built in 2000 by Gunderson Marine of Portland, Oregon.  The Swan Island was built in 2001 by Orange Shipbuilding Company of Orange, Texas.

The dump barges are raked fore and aft, and measure approximately 180 feet long by 44 feet wide and 15 feet deep.  The v-shaped cargo hopper occupies much of the internal volume of the barge, and measures approximately 128 feet long by 37 feet wide and 13 feet deep at the deepest point, with a capacity of 1700 cubic yards.  The barges have hinges on the fore and aft deck, and through the operation of two hydraulic rams split open longitudinally to dump the contents of the hopper.  This opening and closing process is the normal method by which the barges are offloaded, and can be triggered manually or via remote control.  There are seals along

5    -    FINDINGS OF FACT AND CONCLUSIONS OF LAW

the vertical and horizontal edges of the hopper, and a draining mechanism to remove water when the barge closes after having dumped its contents.  Four air-filled voids are located midship on each side of the hopper, accessible via manholes.  Around the top of the starboard and port sides of the hopper is a three foot tall coaming (rail).  A water-tight deck house, located aft, holds the diesel engine that powers the hydraulic systems, as well as the ship's batteries and other electronics.

There are two notable differences between the barges.  First, the voids of the Sand Island are painted red, while the voids of the Swan Island are painted white.  Second, the hopper plating on the Sand Island is 3/4 of an inch thick, while the plating on the Swan Island is 11/16 of an inch thick.  The plates are made of ABS grade A36 steel, which means they are ordinary steel plates, but there is no dispute they were suitable for these dump barges in normal operation.

### C.    Dredging Operations

The court finds that the hoppers of the dump barges were damaged as a result of an unloading process whereby a bucket was used to scoop the dredge material from inside the v-shaped hopper impacting with the exposed sides of the hopper in the process.  This type of unusual unloading procedure was done at two of the dredging sites.[3]

### 1.    Hylebos Waterway

Dredging took place at the Hylebos Waterway from June 27 to November 10, 2003, and from January 21 to February 19, 2004.  Dredge material was loaded by the Crystal Gayle into the Sand Island, Swan Island and other barges.  The material was either dumped at an ocean disposal

---

[3] Only normal unloading by opening the dump hoppers was done at the Thea Foss project.

6   -   FINDINGS OF FACT AND CONCLUSIONS OF LAW

site, or in a containment cell in the Hylebos Waterway ("Slip 1").  At the ocean disposal site, and during the first phase at Slip 1, the dump barges operated in their normal manner to discharge the dredged material.  However, during the second phase, the barges were unloaded by a crane located on the berm sealing off the Slip 1 containment cell.  The unloading was done using a 4200 Manitowoc crane equipped with a torque converter that allowed for control of the rate of descent of the bucket.  The unloading bucket used was an eight-yard blunt nose clam shell bucket weighing approximately 20,000 pounds.  Dredge material was moved into a smaller barge on the other side of the berm for distribution inside the containment area.  Miller used the crane to unload the barges for a period of twenty one days.

### 2.    Duwamish Waterway

Dredging took place at the Duwamish Waterway from November 12 to December 20, 2003, and from January 7 to January 20, 2004.  Dredge material was again loaded by the Crystal Gayle into the Sand Island and Swan Island.  The barges were transported to Terminal 25 in Seattle, Washington, to be offloaded by third-party defendant Wilder Construction Company ("Wilder").  The offloading of the barges took substantially longer than the loading, and as a result the project was at times behind schedule.  Wilder used a blunt nose clam shell bucket and a long reach excavator, another unusual technique, to unload the barges for a total of thirty nine days.  Wilder crane operators swung the bucket over the barges and dropped it at an angle, resulting in direct impact with the slanted steel hopper.

### 3.    Alaska Dredging

After Miller completed its work in early 2004, the vessels were slated to be used as part of a McAmis dredging operation in St. Paul, Alaska.  Before they could be transported to Alaska,

McAmis had to perform some repairs to ensure that they were seaworthy, complied with American Bureau of Shipping ("ABS") standards, and would be safe to operate in the Bering Sea.  The project in St. Paul involved dredging a new harbor, and the work done in 2004 consisted of mostly dredging and removing soft sand and a few boulders from the outer harbor area.  Once the work in Alaska for the year was complete, the vessels were moved back to Oregon for further repairs, including hopper repairs that had not been performed prior to departure for Alaska.

### D.    Surveys

The Amended Subcontract called for surveys of the vessels in order to aid the parties in determining what damage occurred during use on Miller's projects.  Compl. Ex. A. ¶ 5.  Two surveys of each vessel were called for, one within twenty four hours of execution of the contract ("on hire survey") and one no sooner than twenty four hours before the termination of the subcontract ("off hire survey").  *Id.*  While these two surveys are the only ones called out in the Amended Subcontract, many more surveys of the vessels were performed during the course of this dispute.  A number of surveyors testified either in person or by deposition, with a wide disparity in opinion as to the amount of damage done to the vessels and other compensation due to McAmis under the Amended Subcontract.  These totals ranged from Miller's final position of $118,498 to McAmis's position of $1,520,650.  The on hire survey of all of the vessels was performed by Captain Lani Miles of Marine Surveyors Inc. ("MSI") at Astoria, Oregon on June 27, 2003.  Miles did not perform the off hire surveys.

### 1.    Crystal Gayle

The off hire survey of the Crystal Gayle was performed on February 24, 2004 by Donald

Lawson of MSI.  Trial Ex. 9.

### 2.    Sand Island

The Sand Island was surveyed twice during the time that it was under contract with Miller.  On November 11, 2003, before the barge was moved from the Hylebos Waterway to the Duwamish Waterway, Montgomery Maritime Survey, Inc. performed a survey finding the hopper to be free of damage.  *See* Trial Ex. 110.  Another survey was done when the barge returned to the Hylebos Waterway, on December 21, 2003.  In that survey, Alexander Gow, Inc., acting on behalf of Montgomery, reported a number of dents in the hopper plating, calling out a total of forty-three dents deeper than 3/4 of an inch.  *See* Trial Ex. 107.  No surveys were done when the barge was moved to the Duwamish Waterway for a second time.

On March 4, 2004, several surveys of the Sand Island took place at Sundial Marine in Troutdale, Oregon.  The Sand Island was in drydock on the day Lawson conducted his off hire survey.  *See* Trial Ex. 11.[4]  T.A. Scully of T.A. Scully Marine Surveyors, Ltd. of Vancouver, Canada, also conducted an examination of the Sand Island on March 4 and 11, 2004.  *See* Trial Exs. 23, 26.  Montgomery was present as an observer.  No repairs were performed on the hopper plating.  Before the Sand Island was transported to Alaska, Lawson also performed the up close survey, detailing damage to the hopper plating down to indents of 1/4 of an inch.

On December 1 and 12, 2004, Scully again examined the Sand Island at Sundial, where repairs were already being done to the hopper plating.  *See* Trial Ex. 25.  The cropped out sections of hopper plating were retained by Sundial and stored outdoors.  Scully also visited

---

[4]  Lawson was also hired on or around this time by McAmis to perform a more in-depth "up close" survey of both barges.  *See* Trial Ex. 91 (March 2004 bill for up close survey).  Unfortunately, Lawson died unexpectedly before trial.

Sundial to do an examination of the cropped plates on June 7 and 23, 2005. *Id.* During those visits, he assayed the dents in the cropped out plates and attempted to correlate them with marks made from the inside of the barge by Lawson during the close up survey.[5] Through this procedure, Scully made an effort to forensically reconstruct the removed hopper plating and to allocate damage between Miller and McAmis on the theory that some hopper damage was done in Alaska.

### 3.    Swan Island

The Swan Island was surveyed by Montgomery and Gow at the same time as the Sand Island in November and December of 2004. Montgomery noted that the hopper was "generally free of damage," Trial Ex. 111, while Gow called out eleven dents deeper than three quarters of an inch, Trial Ex. 108. The off hire of the Swan Island was performed by Lawson on March 19, 2004. Trial Ex. 12. He also completed reports on a construction defect involving the manhole covers, which leaked, Trial Ex. 13, and the failure of the coating inside the voids, Trial Ex. 14. Scully conducted an examination of the Swan Island at the same time that Lawson did his off hire survey. Trial Ex. 99. Scully performed additional survey work on the Swan Island while it was at Marine Industries Northwest, Inc. ("MINI") in Tacoma, Washington for repairs. He visited the barge on September 14, and also examined the cut out plates, also stored by MINI, from the hopper on October 16 and 27, 2004. Trial Ex. 99. Scully did a the same forensic analysis of the plates from the Swan Island, attempting to assign damage to the pre- and post-

---

[5] There is some dispute in the evidence as to whether the marks on the interior of the Sand Island's hopper plates were made with chalk, a grease pen, or both. *See* Lawson Dep. at 302-07.

Alaska time periods.[6]

### E.    Repairs

Even before Miller completed the dredging called for in the Amended Subcontract, it became clear to the parties that there was likely to be a dispute about damage done to the vessels. After a flurry of non-productive communications and disputes about the transportation of the vessels, the barges were returned to Oregon, where the surveys and repairs began. Initial repairs were done at Sundial in March and April 2004. As previously mentioned, the vessels were then transported to Alaska, where they were used for dredging mostly sand and some boulders, using only the dumping mechanism for unloading. McAmis solicited bids for hopper repairs based on the close up surveys by Lawson. The Swan Island was scheduled for repairs at MINI, and the Sand Island at Sundial. When the barges eventually returned from Alaska, much of the hopper plating in both vessels was replaced. Miller refused to pay for many of the repairs done to the barges, and McAmis filed suit on September 16, 2004. On July 20, 2007, Miller tendered a payment of $169,887.26 for a portion of the repair costs and accrued interest that it agreed was properly billed to Miller. McAmis refused the payment, which was deposited with the court in accordance with 28 U.S.C. § 2041 on September 4, 2007.

*    *    *

What remains disputed and therefore must be resolved by the court, as the trier of fact, are the following issues:

1.    Whether, under the Amended Subcontract, McAmis is entitled to reimbursement for the cost of repair for all bucket damage to the barges, or only for bucket

---

[6] Lawson used a black marker to indicated damage on the inside of the voids.

damage in excess of ordinary wear and tear;

2.    Whether, under the Amended Subcontract, McAmis must indemnify Miller from damage to the vessels;

3.    Whether, under the Amended Subcontract, McAmis's only recourse for damage to the vessels is insurance; and

4.    What portion of the damage, and hence cost of repairs, to the vessels is properly attributed to Miller under the Amended Subcontract.

<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

**A.    Contract Issues**

As an initial matter, the court finds that, in drafting the subcontract, the parties intended to create an agreement that allotted responsibilities and risks in a manner analogous to a bareboat charter.  The Amended Subcontract provides that it "is governed by the laws of the State of Oregon and all other applicable federal law, without giving effect to any conflict-of-law principle of any jurisdiction."  Compl. Ex. A ¶ 19(b).  Under Oregon law, contract interpretation is a three step process.  *Yogman v. Parrott*, 937 P.2d 1019, 1021 (Or. 1997).  "First the court examines the text of the disputed provision, in the context of the document as a whole.  If the provision is clear, the analysis ends."  *Id.*  The second step of analysis is to "examine extrinsic evidence of the contracting parties' intent."  *Id.* at 1022.  Finally, "[i]f the meaning of the contractual provision remains ambiguous after the first two steps have been followed, the court relies on appropriate maxims of construction."  *Id.*

**1.    Indemnification and Insurance**

Miller argued at trial that the "Liability" provision of the Amended Subcontract requires

that McAmis indemnify Miller for any and all damage to the vessels.  However, this is at odds

with the plain meaning of the contract when viewed as a whole.  The Amended Subcontract's

"Liability" commits McAmis to "indemnify and hold harmless Miller . . . from and against any

and all claims actions, proceedings, damages, liabilities, and expenses of any kind . . . arising out

of . . . loss or damage to the Vessels . . . ."  Compl. Ex. A ¶ 12(a).  However, Schedule A of the

Amended Subcontract, entitled "Subcontract Specifics" sets forth specific requirements that

Miller compensate McAmis for "any damage exceeding ordinary wear and tear," to the Crystal

Gayle and "any bucket damage and such other damage exceeding ordinary wear and tear" to the

dump barges during the course of the contract.  Compl. Ex. A, Schedule A ¶ 2.  To read the

general "Liability" provisions as covering damage to the vessels that is specifically called out as

Miller's responsibility in Schedule A is illogical.  Further, such an interpretation would render

much of the specific language in Schedule A surplusage.  Accordingly, the court finds that the

"Liability" provision applies only to damage caused by third-parties outside of the scope of work

in the Amended Subcontract.  McAmis had no duty to indemnify Miller for damage caused by

Miller or by those operating on Miller's behalf.

Miller raised a similar argument under the "Insurance" provision of the Amended

Subcontract, which provides that "[t]he parties will prosecute claims against [their] insurance to

obtain reimbursement for any such loss, damage, or liability to the fullest extent possible under

the coverages provided, and will look solely to such insurance for the recovery of any loss,

damage, liability and expense."  Compl. Ex. A ¶ 11(d).  Again, this language is plainly at odds

with the specific repair cost reimbursement provisions in Schedule A.  The court finds that the

general insurance provisions in the Amended Subcontract do not require McAmis to look solely

to insurance to recoup repair costs covered by Schedule A.

### 2.    Special Servants

Under the Amended Subcontract, McAmis provided crew for the vessels.  Compl. Ex. A.
¶¶ 1, 4.  The crew remained employees of McAmis, but their wages for work under the Amended
Subcontract were paid by Miller.  *See* Compl. Ex. A., Schedule A ¶ 2(b).  For all of the dredging
operations done under the Amended Subcontract, McAmis personnel operated the dredge crane
and loaded the barges.  They were at times also involved in moving the barges.  During all of
these operations, the Amended Subcontract specified that McAmis "shall have no responsibility
for such operations . . . and if any personnel of [McAmis] participate in decisions or
recommendations relating to the Cargo, [i.e., dredge material,] such acts will be as Miller's
special servant for such purposes."  Compl. Ex. A. ¶ 16.  The clear meaning of this provision is
that during loading, unloading and transport operations, liability for any actions by McAmis'
crews fell on Miller, and not on McAmis.  *See, e.g.*, *Hopfer v. Staudt*, 298 P.2d 186, 192-95 (Or.
1956) (holding that a driver who was supplied with a truck as part of a lease was the borrowed
servant of the lessee, and that the lessee alone was responsible for his actions in an accident).
Accordingly, the court finds that Miller was accountable for repairs to the vessels for damage
arising from the actions of McAmis personnel in the course of performing their duties under the
Amended Subcontract.

### 3.    Bucket Damage

For the Crystal Gale, Schedule A requires that Miller reimburse McAmis "at cost for
repair . . . due to any damage exceeding ordinary wear and tear as identified in the" on and off
hire surveys.  Compl. Ex. A, Schedule A ¶ 2(a)(ii).  However, for the dump barges, Schedule A

includes language stating that Miller will reimburse McAmis "at cost for repair . . . due to *any*

*bucket damage* and such other damage exceeding ordinary wear and tear as is incurred during

use . . . or is identified in the" on and off hire surveys.  Compl. Ex. A, Schedule A ¶ 2(a)(iii)

(emphasis added).  McAmis initially took the position that the difference in language between

these clauses meant that Miller was liable for repairs of any damage caused by buckets, not

simply bucket damage that exceeded normal wear and tear.  However, the standard adopted by

the court and all of the surveyors involved is that any dent under one-half of an inch is ordinary

wear and tear and is not compensable.  Thus, any dents over 1/2 of an inch exceed ordinary wear

and tear.

### B.     Apportioning Repair Costs

It is apparent to the court that John McAmis wanted his hopper barges, which were in

like-new condition at the time of the on hire surveys, to be returned to like-new condition at the

end of the contract.  *See, e.g.*, Zink Dep. at 21-22 (ABS surveyor noting that "repairs necessary

to return the vessel to near new condition").  He, in effect, ordered the shipyards to do just that

by choosing the repair option that called for replacing approximately 85% of the hopper plating

by cutting out large sections of hopper plate, many in the range of 8x14 feet in size, in lieu of

using smaller "postage stamp" patches in areas where there was damage.  Another example of

the desire to have his vessels appear like new was his request that the entire bottoms of hulls be

sandblasted and repainted.  This was a significant and unnecessary undertaking given that the

hull repairs attributable to Miller were constrained to a relatively small area, and the scrapes to

the bottom fell within the definition of ordinary wear and tear.  In what is essentially an

accounting dispute, Miller raises arguments about almost every individual line item billed by

15  -  FINDINGS OF FACT AND CONCLUSIONS OF LAW

McAmis.  The issues raised are taken up below.

        1.        **Barge Charges**

             a.        **March Repairs**

Although there was no underwater or drydock survey during the on hire, the court finds

that the general like-new condition of the hopper barges and the limited use that they had been

put to between their construction and the Miller projects are consistent with finding that they

were free of damage below the waterline.  Accordingly, the repairs done to make the vessels

seaworthy for the journey to Alaska in February and March 2004 were properly charged to

Miller as damage.  However, the court finds that the following charges were not properly billed

to Miller for the Sand Island:

| Item | Labor (hours) | Charge |
|------|--------------:|-------:|
| Pressure washing | 65 | $3,351.00 |
| Painting hull | 86 | $10,591.58 |
| Hull blasting | 189 | $10,150.82 |
| Removing mud from hydraulic compartments | 36 | $1,548.00 |
| Cleaning tanks | 422 | $18,475.94 |
| Painting name, draft numbers, load line | 7 | $339.40 |
| **Total** | 805 | $44,456.74 |

Since the 805 hours billed to these tasks represent about half of the total of 1,551 hours

billed, the court finds that Miller is responsible for four lay days, rather than the eight billed.

Miller tendered $18,411.46 plus accrued interest for the March repairs to the Sand Island.  In

addition to the tendered amount, of the disputed $83,697.39 for work on the Sand Island, Miller

is liable for $37,056.26 plus accrued interest from twenty days after the invoice date of April 15,

16  -  FINDINGS OF FACT AND CONCLUSIONS OF LAW

2004.

Similarly, the court finds that the following charges were not properly billed to Miller for the Swan Island:

| Item | Labor (hours) | Charge |
|------|--------------:|-------:|
| Pressure washing | 78 | $3,549.00 |
| Painting hull | 107 | $12,488.88 |
| Hull blasting | 315 | $19,198.35 |
| Cleaning tanks | 248.5 | $11,167.06 |
| Painting name, draft numbers, load line | 16 | $823.00 |
| **Total** | 764.5 | $47,226.29 |

Since the 764.5 hours billed to these tasks represent about sixty percent of the total of 1,207.25 hours billed, the court finds that Miller is responsible for three lay days, rather than the eight billed. Miller tendered $11,884.62 plus accrued interest for the March repairs to the Swan Island. In addition to the tendered amount, of the disputed $77,060.63 for work on the Swan Island, Miller is liable for $27,104.34 plus accrued interest from twenty days after the invoice date of April 15, 2004.

The court finds that most of the repairs done to the Crystal Gayle were properly allocated between McAmis and Miller, per McAmis's billing. However, Miller is not responsible for the starboard spud guide repairs. Miller tendered $6,166.75 plus accrued interest, and is also liable for $27,056.26 plus accrued interest from twenty days after the invoice date of March 22, 2004.

### b.    Post-Alaska Repairs

The lion's share of the cost of repairs was incurred when the hopper steel plating in the two barges was repaired after the barges returned from Alaska. As an initial matter, the court

17  -  FINDINGS OF FACT AND CONCLUSIONS OF LAW

finds that the Lawson surveys are the controlling off hire surveys for the purpose of determining what damage was done to the barges during their use by Miller.  He was the surveyor selected by and paid for by Miller.  *See* Trial Exs. 46, 50.  However, the court also finds that by the time he went to Sundial to perform the off hire survey of the Sand Island, Lawson had agreed to perform the more detailed close up survey for McAmis.  This fact, coupled with Lawson's further work as a personal representative for McAmis during the repairs to the dump barges, casts a shadow over Lawson's neutrality in performing the off hire surveys.  Miller has also argued that Lawson provided an early copy of the off hire reports to McAmis and his counsel, but not to Miller, and that he may have altered the reports in response to feedback from McAmis.  Because Lawson passed away during the pendency of this litigation, the court is limited to gauging his credibility by examining his reports and deposition testimony.  It is notable that every surveyor who knew Larson spoke to his honesty and integrity, regardless of whether they were a witness for Miller of for McAmis.

Despite the shortcomings, the court finds Lawson's off hire surveys credible.  Because he wetted down the hoppers to examine them, it *is* possible that he detected dents present at the on hire survey that Miles did not see when examining the dry hoppers.  The photographs in evidence demonstrate that it is much easier to see dents in the hopper plating when it has been wetted down, and that even significant dents are difficult to see in dry hopper plating.  But, it is unlikely that there were any significant dents in the hopper plating at the time of the on hire.  For example, even Peter Miller, Miller's Marine Equipment Manager opined at trial that the barges "were in amazing shape, we had never seen barges that nice before."

The forensic analysis by Scully, while inventive, is not convincing.  His methodology

depends too much on the accuracy of the markings made by Lawson during the up close survey.

Those marks, made on the inside of the voids, could have been worn off or otherwise removed in

the time between the up close survey and the examination of the removed steel plates.  Further,

some dents could have been added to the plates in the handling process, or released as pressure

was eased by the cutting of the plates.  The parties acknowledge that the Scully hypothesis and

the Lawson reports cannot be reconciled.  As noted above, the Lawson reports, which were

independently confirmed in an additional survey by William Kelly, are the controlling surveys

for the purposes of the Amended Subcontract.

Even accepting the Lawson reports as correct, two questions remain.  First, was all of

damage called out in the reports more than "normal wear and tear," and if so, were the repairs

done reasonable in light of the damage?  Lawson believed that all of the damage called out in his

reports that was over 1/2 of an inch was beyond normal wear and tear.  *See* Lawson Dep. at 341-

43.  These barges are designed to handle dredge materials that can include a wide variety of

heavy debris, including pilings, boulders, and metal scraps.  However, when the dredge material

is known to be of a sort that may damage the hopper plating, the hoppers are often lined with

timbers or other means to prevent such damage.  As mentioned previously, the court finds that

normal wear and tear for a hopper barge does not include indents less than 1/2 of an inch for the

operations contemplated under the Amended Subcontract.  Here the primary source of damage to

the hopper plating was not the loading of dredge material; rather, the damage in dispute to the

hoppers was primarily done by buckets, primarily by Wilder at the Duwamish Waterway, where

the dredge material was of a relatively soupy and soft consistency, and was not dumped using the

normal split hopper method.  The crane used there, as operated by Wilder, was swinging and

19  -  FINDINGS OF FACT AND CONCLUSIONS OF LAW

then dropping the bucket into the barge at an angle so that the corners of the bucket would impact the hopper plating. Although fault is not an issue, the acts of Wilder's crane operator showed a reckless disregard and abuse of equipment as he repeatedly dropped heavy buckets from a height directly onto the steel hopper plates, which he should have known was causing unnecessary damage. Dump barges can be unloaded with buckets by careful operators, but not in the way utilized by Wilder. Additionally, the use of an excavator to pin the barges to the pier and to scoop out dredge material caused contact with and damage to the hopper plating. The Gow surveys confirm that damage occurred to the barges during the first period of work at the Duwamish Waterway. As mentioned, the court finds that for the purposes of *bucket damage* to the hopper plating, indents in excess of 1/2 of an inch exceed ordinary wear and tear. McAmis has shown, through the Lawson report and evidence adduced at trial, that bucket damage was the main source of damage to the hopper plating.

Finally, even assuming that all of the indents and damage to the hopper plating was caused by Miller, were the repairs undertaken by McAmis reasonable? The court finds that they were not entirely reasonable. McAmis demonstrated a consistent philosophy of maintaining the vessels to a meticulous standard that exceeds what the court deems reasonable. In the context of the hopper plating, the letter quote from MINI is instructive. The cost for a less aesthetically pleasing patchwork repair of both barges, replacing only the longitudinal stiffeners called out as tripped by Lawson, and making smaller individual inserts was quoted by MINI as $865,907. Trial Ex. 131. The quote for a repair using large plates of steel with new longitudinal members, the type of repair ultimately done, was $1,126,362. The latter methodology involved significantly more steel, but less welding, and commanded a thirty percent price premium. A

premium that McAmis must pay.  The court finds that the extra cost was not justified under the contract.  Nothing in the record suggests that the patchwork repair methodology would impact the efficacy of the barges, even when handling the sticky Alaskan mud.

McAmis claims costs of $446,568.00 for hopper repairs to the Swan Island, and $575,676.33 for repairs to the Sand Island, for a total of $1,022,244.33.  The court finds that this repair cost should be reduced to match the cost of reasonable but less attractive repairs, and thus finds that Miller is responsible for $785,865 of the hopper plating repair costs, plus interest on this amount from twenty days after November 11, 2004.  The costs of financing these repairs through Key Equipment Finance are not compensable, and McAmis cites no authority for such an award.

### c.    Vessel Use Fees

McAmis seeks payment of vessel use fees for the time periods when the dump barges were being repaired.  Under the Amended Subcontract, the monthly vessel use fees for the barges "will continue to accrue during any repairs conducted following termination of this agreement."   Compl. Ex. A, Schedule A ¶ 2.  McAmis billed Miller for vessel use for the balance of February 2004, plus March, and one day of April for the duration of the pre-Alaska repairs at Sundial.  In May 2004, Miller paid the February use fees.  The unpaid fees for the period of  pre-Alaska repairs total $74,666.67.  The barges did not have the hopper repairs done at that time because McAmis needed to use them for dredging in Alaska.  The court finds that Miller was responsible for damage that was repaired after the barges returned from Alaska, and can be held responsible for some of the vessel use fees during both the pre-Alaska and post-Alaska repairs.  Given the various items of work done to the barges during pre-Alaska repairs

that were not properly billed to Miller, the court finds that some of the pre-Alaska use fees

should be credited to cover the time needed for the hopper repairs.  The timing of the post-

Alaska lay-up of the vessels was at the convenience of McAmis.  Accordingly, Miller is liable

for pre-Alaska repair vessel use fees, consisting of $70,000.00 plus accrued interest from twenty

days after the invoice date of March 19, 2004, for $4,666.67 plus accrued interest from twenty

days after the invoice date of April 2, 2004, and for post-Alaska vessel use fees consisting of

$70,000 plus accrued interest from twenty days after the invoice date of November 30, 2004.

### 2. Other Charges

#### a. Payroll for Surveys

McAmis seeks a total of $24,500.13 plus accrued interest for payroll to Del Thompson

and Craig Chartrand for assistance in performing the off hire surveys.  Trial Ex. 70 at 18.  The

court finds the work by those agile workers was necessary as part of the survey process, and

accordingly finds that in addition to the $4,845.20 plus accrued interest tendered, Miller is also

liable for $15,775.61 plus accrued interest from twenty days after the invoice date of April 12,

2004..

#### b. Surveyor Fees

McAmis seeks a total of $28,336.24 plus accrued interest for surveys done as part of the

repair process.  These surveys are above and beyond the on hire and off hire surveys, and include

Lawson's attendance at repairs as McAmis's representative and the ABS surveys of the damage

repairs in March 2004.  Trial Ex. 70 at 20.  Miller argues that these surveys are outside the scope

of the survey clause in the Amended Subcontract.  Compl. Ex. A ¶ 5.  The court agrees with

Miller.  However, the ABS surveys are a requirement after certain damage repairs in order for

the vessels to keep their class certification.  Accordingly, those surveys are compensable as encompassed within the costs of damage repairs.  Miller is thus liable for $5,066.00 plus accrued interest from twenty days after the invoice date of April 14, 2004.

### c.    Inventory

McAmis seeks a total of $80,041.28 plus accrued interest for inventory items.  There is little dispute about most of the inventory items, and Miller tendered payment of $70,733.44 plus accrued interest.  The main area in dispute involves the use of a superior grade of boom wire for the crane.  The court agrees with Miller, and finds Miller liable for only the amount tendered.

### d.    Miscellaneous

The court finds that of the costs listed on Invoice 44b, in addition to the tendered amount of $4,643.15 plus accrued interest, Miller is liable for an additional $5,899.00 plus interested accrued from twenty days after the invoice date of April 14, 2004.  Miller is not liable for the new radio unit on Invoice 36b, and has tendered payment for the septic tank costs listed on Invoice 33b, in the amount of $1,188.73 plus accrued interest.  Miller is responsible for paying the tendered towing costs of $1,717.31 in addition to  towing costs of $2500.00 plus accrued interest from twenty days after the invoice date of May 31, 2005.  Finally, the court finds that Miller is not liable for costs on Invoices 49, 51, and 52, for travel and deposition time and plate storage.  Miller's tenders of $2,538.36 and $71.51 plus accrued interest satisfy its obligations for the business license costs on Invoice 47b, and the Visa charges on Invoice 36b, respectively.

### <u>CONCLUSION</u>

The amounts for which Miller is liable under the contract are summarized below:

23  -  FINDINGS OF FACT AND CONCLUSIONS OF LAW

| Item | Amount | Status |
|------|--------|--------|
| Sand Island (March) | $55,467.72 | $18,411.46 (tendered)<br>$37,056.26 plus interest due |
| Swan Island (March) | $38,988.96 | $11,884.62 (tendered)<br>$27,104.34 plus interest due |
| Crystal Gayle | $33,223.01 | $6,166.75 (tendered)<br>$27,056.26 plus interest due |
| Hopper Repairs | $785,865.00 | $785,865.00 plus interest due |
| Vessel Use Fees | $144,666.67 | $144,666.67 plus interest due |
| Payroll | $20,620.81 | $4,845.20 (tendered)<br>$15,775.61 plus interest due |
| Surveyor Fees | $5,066.00 | $5,066.00 plus interest due |
| Inventory | $70,733.44 | $70,733.44 (tendered) |
| Miscellaneous | $18,558.16 | $10,159.16 (tendered)<br>$8,399.00 plus interest due |
| **Total** | $1,173,189.77 | $122,200.63 (tendered)<br>$1,050,989.14 plus interest due |

This case demonstrates both the importance of thorough on and off hire surveys and the difficulty of reconstructing the chronology and origins of damage to maritime equipment. A judgment incorporating the court's monetary calculations and allotments consistent with these Findings of Fact and Conclusions of Law is filed herewith. Plaintiff's petition for attorney's fees and costs shall be filed subsequent to entry of that judgment, in accordance with Federal Rule of Civil Procedure 54.

DATED this 16th day of April, 2008.


  /s/ ROBERT E. JONES
ROBERT E. JONES

24 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Judge